IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |
|---|---|
| ARNOLD VARGAS, <br><br>                 Plaintiff, <br><br>     v. <br><br> MOVE, INC., <br><br>               Defendant. | Civil Action No. <br><br> COMPLAINT FOR DECLARATORY <br> AND INJUNCTIVE RELIEF |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Arnold Vargas, by and through undersigned counsel, seeks a permanent injunction requiring a change in Move, Inc.'s ("Defendant" or "Move") corporate policies to cause the websites it owns, operates, or controls, to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

### INTRODUCTION

1.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at

https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed April 23, 2019).

2. Arnold Vargas is legally blind. Mr. Vargas has a hereditary condition called Leber congenital amaurosis. Leber congenital amaurosis is an eye disorder that primarily affects the retina, which detects light and color, and causes severe visual impairment beginning in infancy. Today, Mr. Vargas uses screen readers, including the built-in Voiceover capability of his iPhone6s and MacBook Pro, combined with Zoom software, to navigate the internet.

3. Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC,* 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.* at *6-7. *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed April 16, 2019) (discussing screen readers and how they work).

4. Defendant "Move Inc. provides unsurpassed real estate information, tools and professional expertise across a family of websites and mobile experiences for consumers and real estate professionals through all stages of the home journey." *See,* https://www.realtor.com/brands

(last accessed April 12, 2019). The Move family of websites includes: http://www.move.com, https://www.realtor.com, http://newhomes.move.com/, http://www.moving.com/, http://www.relocation.com/, http://www.doorsteps.com/, http://www.topproducer.com/, http://www.fivestreet.com/, http://www.listhub.com, http://www.homefair.com/, https://www.remodelista.com/, https://www.gardenista.com/, https://www.organized-home.com/, and https://www.opcity.com/ *See,* https://www.realtor.com/privacy-policy/ (last accessed April 15, 2019). Move, Inc., is headquartered in Santa Clara, California.

5.     Defendant Move, Inc. owns a portfolio of companies and websites which service the housing market. These websites provide information for consumers seeking to purchase, long term rental, short term rental, or obtain home lending services. Move, Inc. owns and controls the following websites:

a.  http://www.move.com: Provides a landing page to access other brands offered by Move, Inc., where a consumer can search for apartments for rent of homes for sale, and then is directed to another Move platform.

b.  https://www.realtor.com: Operated by Move, Inc., realtor.com® offers a comprehensive list of for-sale properties, as well as the information and tools to make informed real estate decisions.

c.  http://newhomes.move.com/: Allows consumers to "Search more new homes than anywhere," "from the largest collection of homes, community developments & builders."

d.  http://www.moving.com/: Provides a service of allowing a consumer to enter their moving destinations and obtain four quotes from pre-screened, qualified movers in the area.

e.  http://www.relocation.com/: Provides a "user friendly interface" that allows consumers to search for movers and moving resources using "the premier online resource for consumers looking to move to a new home or apartment, whether it's across town, across the country or halfway across the world."

f.  http://www.doorsteps.com/: Provides a service of apartment listings by state.

g.  http://www.topproducer.com/: Sells real estate CRM software to real estate professionals.

h.  http://www.fivestreet.com/: Sells lead follow up software to real estate professionals.

i.  http://www.listhub.com: Sells an online-based marketing tool for real estate professionals.

j.  http://www.homefair.com/: Provides a service of searching and scheduling movers and other moving tools, including moving calculators.

k.  https://www.remodelista.com/: Provides a services of remodeling guidebooks, articles, and photographs, and allowing homeowners to then research and choose a contracting firm to help with the remodel process.

l.  https://www.gardenista.com/: Provides a services of landscape remodeling guidebooks, articles, and photographs, and allowing homeowners to then research and choose a landscaping firm to help with the landscaping process.

m.  https://www.organized-home.com/: Provides a service of organizing guidebooks, articles, and photographs, and allowing homeowners to then research and choose a firm to help with the organizing process.

n. https://www.opcity.com/: Provides real estate referral services to real estate professionals.

*See,* https://www.realtor.com/privacy-policy/ (last accessed April 15, 2019). The websites listed above are collectively referred to herein as "Defendant's Websites" or "Websites."

6. Move, Inc., through its portfolio of Websites, provides an invaluable service to consumers seeking to rent or buy a home or apartment. Move's search capabilities allow consumers to easily narrow in on available homes and rentals, check for price history, compare nearby listings, and other home-related services, through the Websites Defendant owns, operates, and controls. *See* Realtor.com, Brands, available https://www.realtor.com/brands (last accessed April 15, 2019).

7. In addition to researching Defendant's home services from the comfort and convenience of their homes, consumers may also use Defendant's Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and obtain moving services. *See*, Realtor.com, Brands, *available* https://www.realtor.com/brands (last accessed April 15, 2019).

8. Defendant is responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

9. Unfortunately, Defendant denies approximately 8.1 million Americans who have difficulty seeing access to its Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at*

https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed April 23, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

10.     Plaintiff brings this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

11.     By failing to make its Websites available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

12.     Because Defendant's Websites are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring that:

a)  Defendant retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Websites,

including all third-party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

b) Defendant work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c) Defendant work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Defendant work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Defendant incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Defendant work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Websites, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Defendant directly link from the footer on each page of the Websites, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Websites;

h) Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Defendant provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)   Defendant provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k)   Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)   Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology; and

m)   Plaintiff, his counsel and their experts monitor the Websites for up to two (2) years after the Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

13.   Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

14.   The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15.     Defendant attempts to, and indeed does so, participate in the Commonwealth's economic life.

16.     Defendant's participation in the Commonwealth hinges, in significant part, on Massachusetts consumers, like Plaintiff, accessing its Websites and using Defendant's products and services. Unlike, for example, a winery that cannot sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an online business open 24 hours a day, 7 days a week, 365 days per year to Massachusetts residents.

17.     As described in additional detail below, Plaintiff was injured when he attempted to access Defendant's Websites from his home in New Bedford, Massachusetts, but encountered barriers that denied him full and equal access to Defendant's online services.

18.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there." *Access Now, Inc. v. Otter Products, LLC*, CV 17-10967-PBS, 280 F.Supp.3d 287, 294 (D. Mass. Dec. 4, 2017) ("*Otter Products*").

19.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

20.     Plaintiff is and, at all times relevant hereto, has been a resident of Bristol County, Massachusetts. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101, *et seq*.

21.    Defendant is a subsidiary of News Corporation, a Delaware corporation. Defendant Move, Inc.'s principle place of business is at 3315 Scott Blvd. Suite 250, Santa Clara, California 95054.

## FACTS APPLICABLE TO ALL CLAIMS

22.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

### DEFENDANT'S ONLINE CONTENT

23.    Move, Inc., through its portfolio of Websites, provides an invaluable service to consumers seeking to rent or buy a home or apartment. Move's search capabilities allow consumers to easily narrow in on available homes and rentals, check for price history, compare nearby listings, and other home-related services, through the Websites Defendant owns, operates, and controls. *See*, Realtor.com, Brands, available https://www.realtor.com/brands (last accessed April 15, 2019).

24.    In addition to researching Defendant's home services from the comfort and convenience of their homes, consumers may also use Defendant's Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and obtain moving services. See, Realtor.com, Brands, available https://www.realtor.com/brands (last accessed April 15, 2019).

### HARM TO PLAINTIFF

25.     Plaintiff attempted to access the Websites from his home in New Bedford, Massachusetts. Unfortunately, because of Defendant's failure to build its Websites in a manner that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Websites.

26.     Plaintiff attempted to access the Websites using Apple's Voiceover technology combined with the ZoomText program.

27.     VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text." *See* Apple, VoiceOver Getting Started Guide, *available at* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed April 23, 2019).



*The VoiceOver cursor—a dark rectangular outline—focused on the word "Accessibility" on screen.*

This caption matches the alternative text that Apple provides in its VoiceOver Getting Started Guide. It illustrates the type of sufficiently descriptive alternative text that screen reader users require to fully and equally access Defendant's Websites.



28.     ZoomText "is a fully integrated magnification and reading program tailored for low-vision users." *See,* https://www.zoomtext.com/products/ (last accessed April 23, 2019). ZoomText allows Plaintiff to zoom into text, as well as change the contrast to help him read content.

29.     Unfortunately, after visiting Defendant's Websites from New Bedford, Massachusetts, and from investigations performed on his behalf, Plaintiff found Defendant's Websites to be largely unusable due to various barriers that deny him full and equal access to Defendant's online content and services. For example, Plaintiff's investigation discovered:

a.     Defendant's Websites have skip to content links that are broken throughout the Websites. An example of this issue is on the Realtor.com main landing page. The first link, skip to Main Navigation, takes you to the element immediately following the skip to content list. The second link should take you to the search box, but is linked to a non-existent ID, so the focus does not move and leaves the user on the same link. This is confusing and can alienate and confuse screen reader users. As these issues occur on main landing pages, it prevents those who rely on screen readers from accessing Defendant's services through their Websites. An example of this is found at https://www.realtor.com/ (last accessed April 23, 2019), and is shown below:



     b.     Defendant's Websites prevent screen reader users from accessing the

services Defendant offers. For instance, Defendant offers those who perceive information

visually the opportunity to search available houses by bedroom number, bathroom number, lot

size, etc. However, these search functions on Defendant's Websites are inaccessible to those

using screen readers. The information here has been nested inside of an element with a role of a

link, the browser overlooks the list information nested within it, making the lot size, number of

bedrooms, and number of baths completely inaccessible to the screen-reader. An example of this

can be found at https://www.realtor.com/ (last accessed April 15, 2019), and is shown below:



30.     Defendant's websites have numerous unlabeled buttons. Thus, when Plaintiff attempted to access Defendant's Websites using Voiceover, the Voiceover technology could not read the content of the Websites for Plaintiff.

31.     These barriers, and others, deny Plaintiff full and equal access to all of the services the Websites offer, and now deter him from attempting to use the Websites. Still, Plaintiff would like to, and intends to, attempt to access the Websites in the future to aid in his home searches, or to test the Websites for compliance with the ADA.

32.     If the Websites were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently research and utilize Defendant's products and access its other online content and services.

33.     Though Defendant may have centralized policies regarding the maintenance and operation of its Websites, Defendant has never had a plan or policy that is reasonably calculated

14

to make its Websites fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

34.     The law requires that Defendant reasonably accommodate Plaintiff's disability by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

35.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

36.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

37.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

## THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

38.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

39.     While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

40.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

41.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Websites, and (b) whether Plaintiff can access the content and services.

**SUBSTANTIVE VIOLATION**

**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

42.     The assertions contained in the previous paragraphs are incorporated by reference.

43.     Defendant's Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Otter Products*, 280 F.Supp.3d 293, n.4 ("Several courts have held that a website can be treated as a public accommodation under Title III of the ADA."); *see also 1-800 Flowers.com*, 2018 WL 839381, *1 ("Defendant does not dispute that its websites are places of public accommodation subject to regulation by Title III of the ADA.").

44.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Websites, it has violated the ADA.

45.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public

accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

46.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

47.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

48.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:   as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

49.     By failing to provide its Websites' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

          (a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Websites;

(b)     affording individuals with visual disabilities access to its Websites that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

50.     Defendant has violated Title III by, without limitation, failing to make its Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

51.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

52.     Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Websites or result in making the Websites different, but enables individuals with visual disabilities to access the Websites Defendant already provides.

53.     Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

54.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

55.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief Plaintiff requests is described more fully in paragraph 12 above.

(C)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Access*

*Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11)

("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction.

Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559

(1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir.

1984), the fee petition may include costs to monitor Defendant's compliance with the permanent

injunction."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-

01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) (same);

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

Dated: April 23, 2019                    Respectfully Submitted,

                                         */s/ Jason M. Leviton*
                                         Jason M. Leviton (BBO# 678331)
                                         **BLOCK & LEVITON LLP**
                                         260 Franklin Street, Suite 1860
                                         Boston, MA 02110
                                         Phone: (617) 398-5600
                                         jason@blockesq.com

                                         Benjamin J. Sweet (*To be admitted Pro Hac Vice*)
                                         ben@sweetlawpc.com
                                         **THE SWEET LAW FIRM, P.C.**
                                         186 Mohawk Drive
                                         Pittsburgh, PA 15228
                                         Phone: (412) 742-0631

                                         Jonathan D. Miller (*To be admitted Pro Hac Vice*)
                                         jonathan@nshmlaw.com
                                         Alison M. Bernal (*To be admitted Pro Hac Vice*)
                                         alison@nshmlaw.com
                                         **NYE, STIRLING, HALE & MILLER, LLP**
                                         33 W. Mission Street, Suite 201
                                         Santa Barbara, CA 93101
                                         Phone: (805) 963-2345

*Counsel for Plaintiff, Arnold Vargas*